IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 18, 2015 Session

## STATE OF TENNESSEE v. RODERICK QUATEL BATES AND EMMETT JONES

**Appeal from the Criminal Court for Hamilton County**
**Nos. 282620, 282621      Barry A. Steelman, Judge**

**No. E2014-01741-CCA-R3-CD – Filed December 15, 2015**

In this consolidated case, the defendants, Roderick Quatel Bates and Emmett Jones, appeal their convictions of aggravated burglary and first degree murder. Mr. Jones challenges the trial court's admission of a photograph of him provided by the Department of Correction and the trial court's denial of his motion to suppress the out-of-court identification of him as a perpetrator. Both defendants challenge the admission of the audio-recorded statements of two witnesses, the admission of the audio recording of a 9-1-1 call made by a State's witness, and the sufficiency of the convicting evidence. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Clancy Covert, Chattanooga, Tennessee, for the defendant, Roderick Quatel Bates.

Lee Ortwein, Chattanooga, Tennessee, for the defendant, Emmett Jones.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William H. Cox, III, District Attorney General; and Lance Pope and Amanda Morrison, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case stem from the October 7, 2011 shooting of the victim, Reginald Clark, following an altercation at a Chattanooga nightclub.

The proof adduced at the defendants' January 2014 trial can best be described as convoluted. That being said, the evidence established that on October 6, 2011, Chattanooga Fire Department Firefighter Michael Battle and, his friend, Derrick Hall met the victim, who was a friend of theirs, for an evening out. The three men went to T.G.I. Friday's, where they ate dinner and where the victim consumed several alcoholic beverages. After leaving the restaurant, the men went to Club 807 Fire and Ice. The victim continued to drink while at the club.

While at the club, the victim encountered his friend and roommate, Marterrious "Munchie" Daniel, who had had an altercation with Roderick Bates, whom he knew as "Poo-Poo." Mr. Daniel had complimented Mr. Bates's girlfriend on her attire, and she had, in turn, doused him with her drink. Mr. Bates had then warned Mr. Daniel to stay away from his girlfriend. When the victim saw Mr. Bates arguing with Mr. Daniel, he raised his shirt to show Mr. Bates a gun tucked into the waistband of his pants. At that point, Mr. Daniel went to calm the victim, and Mr. Battle, who did not witness the altercation between Mr. Daniel and Mr. Bates, suggested that the victim leave given his level of intoxication.

Mr. Battle left the club with the victim, Mr. Hall, a woman named Larinder "Kay-Kay" Lewis, and a man named Michael "Fat Daddy" Ford. The party traveled to the victim's house, where the victim, Mr. Daniel, Ms. Lewis, and Mr. Ford went inside while Mr. Battle and Mr. Hall drove away.

Sanford Ballou, a friend of the victim's, also encountered the victim and the others at Club 807 Fire and Ice. Mr. Ballou encouraged the victim to leave, and he rode with his friend, Cortland Henderson, to the victim's house. Mr. Ballou and Mr. Henderson went inside the victim's house briefly before returning to Mr. Henderson's car in the victim's driveway. From that vantage point, Mr. Ballou saw two men, a taller man with short, plaited hair and a second man who was "smaller, shorter . . . thinner, [with] a low haircut," armed with handguns walk by Mr. Henderson's car toward the victim's door. Although he denied having done so at trial, prior to trial, Mr. Ballou identified Mr. Bates as the man with whom the victim had argued and Mr. Jones as the taller of the two men who had approached the victim's house with guns. As the two men approached the house, Mr. Ballou and Mr. Henderson got out of the car and ran to the victim's back door.

Inside the house, the victim, Ms. Lewis, Mr. Daniel, and Mr. Ford were drinking and socializing in the kitchen when the two armed men entered the house and began firing. Ms. Lewis and Mr. Ford ran out of the house and hid. Mr. Daniel dropped to the floor, and the victim was shot three times. At trial, Mr. Daniel testified that one of the perpetrators had facial hair and short, plaited hair, which description matched Mr.

-2-

Jones. In her statement to police, the majority of which was admitted as substantive evidence, Ms. Lewis, who was familiar with both Mr. Bates, whom she knew as "Poo-Poo," and Mr. Jones, whom she knew as "D-Baby," identified Mr. Bates and Mr. Jones as the men who entered the victim's house and shot the victim.

Both Mr. Ballou and Ms. Lewis telephoned 9-1-1. Mr. Ballou told the dispatcher that the victim had been shot but that he did not know who had shot the victim. Mr. Daniel, whose voice could be heard on the call, suggested that the taller of the two shooters had been Mr. Ballou's "partner that just got out," an apparent reference to Mr. Jones. Someone telephoned Mr. Hall, who told Mr. Battle that the victim had been shot. Because they were only a short distance away, Mr. Battle and Mr. Hall returned to the victim's residence, where Mr. Battle attempted cardiopulmonary resuscitation on the victim. Mr. Daniel removed $250 from the victim's shirt pocket and took two guns from the victim's house and disposed of them in the woods behind the house.

After the police arrived, Ms. Lewis and Mr. Ford left the scene, but Mr. Ballou and Mr. Daniel remained behind. All four were taken to the police station, where each provided a recorded statement to the police.

An autopsy established that the victim died from multiple gunshot wounds.

Deoxyribonucleic acid ("DNA") testing performed by the Tennessee Bureau of Investigation ("TBI") identified Mr. Bates's DNA on the plastic tip from a cigar butt that was discovered in the street in front of the victim's house.

Based upon this evidence, the jury convicted both defendants as charged of especially aggravated burglary and first degree murder. The trial court sentenced both defendants to life imprisonment for their first degree murder convictions and 10 years' incarceration, to be served concurrently with the life sentences, for their especially aggravated burglary convictions. Both defendants filed timely but unsuccessful motions for new trial.

In this timely appeal, Mr. Jones challenges the use of a Tennessee Department of Correction ("TDOC") photograph of him and the admission of the out-of-court identification of him as one of the perpetrators. Both defendants assert that the trial court erred by admitting into evidence the audio recording of the 9-1-1 call placed by Mr. Ballou and the audio-recorded statements of Ms. Lewis and Mr. Ballou, and both defendants challenge the sufficiency of the convicting evidence.

## I. *Photograph and Out-of-Court Identification of Mr. Jones*

Mr. Jones complains that the trial court erred by admitting into evidence the pretrial identifications of him made by Mr. Ballou and Ms. Lewis, arguing that the identification procedure was unduly suggestive, and by allowing a photograph of him obtained from TDOC to be displayed to the jury in conjunction with those identifications.

Prior to trial, Mr. Jones challenged the pretrial identifications and asked the trial court to prohibit any evidence of his prior incarceration, including the TDOC photograph that both witnesses had used to make their identifications.

The evidence adduced at the hearing on the defendant's motion established that during her statement to the police, Ms. Lewis identified the perpetrators as Poo-Poo and D-Baby, two men she had known for quite some time. She knew at least part of Poo-Poo's given name but knew D-Baby only by his nickname. At that point, Chattanooga Police Department Detective Adam Emery showed Ms. Lewis a single photograph of each defendant. Detective Emery utilized Mr. Bates's driver's license photograph, but the only recent photograph of Mr. Jones that was available for his use was Mr. Jones's TDOC photo. Only after Ms. Lewis identified D-Baby as one of the perpetrators and after she explained that she had known D-Baby most of her life and that she knew he had recently been released from prison, Detective Emery showed Ms. Lewis the TDOC photograph of Mr. Jones and asked her whether the man in the photograph was D-Baby. She confirmed that Mr. Jones was the person she knew as D-Baby. She said that she had grown up across the street from Mr. Jones, that she knew his family, and that she had "always called him D-Baby."

Similarly, during his statement to the police following the shooting, Mr. Ballou identified "his cousin" D-Baby as one of the perpetrators. Mr. Ballou told officers that he had grown up near D-Baby, that he knew that D-Baby had "just got out of the feds," and that he had gone to D-Baby's mother's house to use marijuana with D-Baby. At that point, Detective Justin Kilgore showed Mr. Ballou the TDOC photograph of Mr. Jones, and Mr. Ballou confirmed that Mr. Jones was the person he knew as D-Baby.

Both Detective Emery and Detective Kilgore explained that when a witness identifies a perpetrator by name and provides a basis for their knowledge, it is the department's policy to show that witness a single photograph for verification of the identification.

At the conclusion of the hearing, the trial court ruled that the identification procedure employed during the questioning of Ms. Lewis was not unduly suggestive and that the State would be allowed to present evidence of the identification during the trial.

-4-

The court took the motion under advisement with regard to the identification provided by Mr. Ballou.

At trial, the State presented proof of the identification made by Ms. Lewis during Detective Emery's testimony and, as part of that testimony, displayed the TDOC photograph of Mr. Jones that had been used during the pretrial identification procedure. Before trial, the State cropped the photograph to remove the "TDOC plate" in an effort to reduce the indication that the photograph had been taken by TDOC. The "height lines" as well as Mr. Jones's attire do, however, reflect that the photograph was taken while he was incarcerated.

## A. Photograph

As an initial matter, the State asks us to deem this issue waived for Mr. Jones's failure to make adequate citations to the record. The State correctly points out that Mr. Jones failed to cite to the locations in the record containing any pretrial ruling on the admissibility of the photograph or his objections to the photograph prior to or during trial and that the record is voluminous, covering well over 1,000 pages. Given Mr. Jones's failure to make appropriate references to the record, we could easily conclude that he waived our consideration of the admission of the TDOC photograph. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on"). That being said, our review of the trial transcript evinces Mr. Jones's objection to the introduction of the photograph during Detective Emery's testimony. At that time, the trial court admitted the photograph on grounds that the photograph showed Mr. Jones's hair in short plaits, which description matched that of the taller perpetrator given by Mr. Daniel. Unfortunately for Mr. Jones, however, the record also evinces that the basis of his objection to the photograph at trial was not, as it is on appeal, relevance. Instead, he objected on grounds that, because it contained the markers of his prior incarceration, the photograph fell into the category of impermissible propensity evidence. *See* Tenn. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait."). In consequence, we must conclude that this issue has been waived. *See State v. Adkisson*, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994) (holding that a "party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court"); *State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) (holding that a party cannot object on one ground at trial and assert new basis on appeal); *State v.*

-5-

*Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12 (Tenn. Crim. App. 1987).

## B. Pretrial Identifications

The State argues that Mr. Jones has also waived our consideration of this issue by failing to make appropriate references to the record, by failing to prepare an adequate record for review, and by failing to secure a ruling on the issue before the admission of the evidence at trial. As the State again correctly points out, Mr. Jones failed to make any references to the hearing on his pretrial motion to exclude the identifications or any rulings by the court on his motion. With regard to the State's claim of waiver via failure to secure a ruling, the transcript of the hearing on Mr. Jones's motion contains the trial court's ruling that Ms. Lewis's identification was not tainted by an unduly suggestive identification procedure and was, therefore, admissible at trial. The court did not rule with regard to Mr. Ballou's pretrial identification at that time, taking the motion under advisement and reserving its ruling until the trial. At trial, Mr. Ballou's identification of Mr. Jones became mired in the discussion of the admissibility of Mr. Ballou's statement to the police, and the trial court did not make a ruling on its admissibility. That being said, Mr. Ballou's prior identification of Mr. Jones via the TDOC photograph was never admitted into evidence. In consequence, only the admission of Ms. Lewis's pretrial identification remains for our review.

An identification procedure that is so impermissibly suggestive "as to give rise to a very substantial likelihood of irreparable misidentification" violates due process. *Simmons v. United States*, 390 U.S. 377, 384 (1968). In *Simmons*, the Court observed that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *Id.* at 383. Noting that "[e]ven if the police subsequently follow the most correct photographic identification procedures . . . , there is some danger that the witness may make an incorrect identification," the Court concluded that the danger of misidentification "will be increased if . . . the photograph of a single such individual recurs or is in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* Although it may be suggestive, an identification may satisfy due process as reliable and admissible if the totality of the circumstances so warrants. *See State v. Brown*, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). Following *Simmons*, the Court established a two-part analysis to assess the validity of a pre-trial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. *Id.* at 198–99. Five factors are to be considered when evaluating the propriety of the identification process:

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199–200.

This case differs from most addressing the admissibility of a pretrial photographic identification in that the witness in this case had known the victim for most of her life. She knew his family and background and was quite familiar with his appearance. She did not identify an unknown individual based upon her recollection of the perpetrator's physical characteristics. Instead, she identified a man she knew well as one of the perpetrators. Under these circumstances, we cannot say that Detective Emery's showing her the TDOC photograph of Mr. Jones amounted to an unduly suggestive identification procedure. Thus, the trial court did not err by admitting Ms. Lewis's pretrial identification of Mr. Jones as one of the perpetrators.

## II. Prior Inconsistent Statements

Both defendants argue that the trial court erred by admitting the audio recordings of Ms. Lewis's and Mr. Ballou's statements to the police, claiming that, because the witnesses admitted having made the statements, extrinsic proof of the statements was not admissible, and that, in any event, the statements were inadmissible hearsay. The State contends that both recordings were admissible via Tennessee Rule of Evidence 803(26).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

As our supreme court recently confirmed, "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*, No. 14A1098, 2015 WL 5032354 (U.S. Oct. 13, 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions–whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule–are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see*

*also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law."). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

Tennessee Rule of Evidence 803(26) provides:

Prior Inconsistent Statements of a Testifying Witness. A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). "Many other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example." *Id.*, Advisory Comm'n Comments.

To be admissible as substantive evidence via Rule 803(26), a statement must first be admissible as a prior inconsistent statement via Rule 613(b). "The purpose of Rule 613(b) is to allow introduction of otherwise inadmissible extrinsic evidence for impeachment." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (citing *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982)). To this end, Rule 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). Under the rule, "[e]xtrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement" because "[t]he unequivocal admission of a prior

-8-

statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness during trial." *Martin*, 964 S.W.2d at 567.  On the other hand, extrinsic evidence of a prior inconsistent statement will be admissible when a witness denies making the statement, equivocates about having made the statement, or testifies that he or she does not recall making the prior inconsistent statement. *Id.* (citing *State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996)).

We review the trial court's decision to admit extrinsic evidence of a prior inconsistent statement pursuant to Rule 613(b) for an abuse of discretion.  *See Hunter v. Ura*, 163 S.W.3d 686, 698 (Tenn. 2005).

### A.  Mr. Ballou

During direct examination, Mr. Ballou testified, in direct contradiction of his prior statement to the police, that although he had seen two armed men approaching the victim's house, he could not identify either man.  He also said, contrary to his earlier statement, that he never got close enough to either man to hear them speak.  When the prosecutor questioned Mr. Ballou about the inconsistencies between his trial testimony and the statement he provided only hours after the victim's murder, the following exchanges occurred:

> Q.  All right.  Do you remember giving a statement to law enforcement?
> A.  Yes.
> Q.  All right.  Do you remember participating in a photo lineup procedure?[1]
> A.  Yeah, I remember that.
>     . . . .
> Q.  So it's your testimony that you did not make this identification?
> A.  No.  I'm saying – they saying I did but I never, I never seen him at the club, period.
> Q.  Okay.  This here, this photo lineup, is it your testimony that you didn't put your initials there saying that was the person Reggie was into it with at the club?
> A.  Yeah, I'm saying my initials there.
> Q.  Okay.
> A.  But I'm saying I ain't see him at no club.
>     . . . .

---

[1] This question related to Mr. Ballou's identification of Mr. Bates from a photographic array.

Q. Okay. All right. So you're not denying that you made this identification on October the 7th?

A. No, I'm not denying that.

Q. You're just –

A. But I'm just saying, I never seen him.

. . . .

Q. Do you recall telling police that you heard the shorter one say "D-Baby" to the taller one?

A. No, I don't recall that, because I ain't hear that because I wasn't in the house.

. . . .

Q. Like you to read this to yourself, bottom of 15 and top of 16.

   Do you remember making that statement to law enforcement?

A. No.

Q. "I don't know. All I know, dude something, when dude ran off, I don't know his real name, but when dude ran off, dude said something about 'D-Baby.' 'D-Baby,' some s*** like 'D-Baby, come on, come on, Bro,' because you know what I'm saying' 'D-Baby, boss, let's go, let's go.'"

A. Huh-uh.

Q. "You know what I'm saying? They ran up the hill. That's all I kept, kept hearing him say, 'D-Baby,' that's all I kept hearing, 'D-Baby, come on.'"

A. No.

Q. Do you deny that you said that?

A. Don't deny I said it but I didn't hear that because I wasn't, I wasn't never near them.

. . . .

Q. Okay. This statement you gave to law enforcement was at 4:59 in the morning on October the 7th of 2011; is that correct?

A. Yes.

. . . .

Q. Do you think your memory of what took place was better two hours after it took place or today, all this time later?

A. Probably then, but some of, some of that stuff, just like I told y'all, I can't, I can't say that I had seen something that I ain't see. I wasn't ever that close to them to hear them discussing or having a conversation between each other.

-10-

Q. Okay. All right. So you don't deny that you said this to law enforcement that day; you just don't remember it that way now? Is that what you're saying?

A. I guess you can say that, because why would I be that close to two people that got a gun and listening to they conversation?

Q. Okay. Well, do you remember giving a description to law enforcement of the people that came into the house that night?

A. Yeah, I remember giving a description, one tall and one short.

Q. Do you remember saying D-Baby was the taller one?

A. I remember they asked what was his description and I said that yeah, he's taller.

     . . . .

Q. Did you tell law enforcement the morning of October the 7th, 2011, that you looked at the taller one in the face and that you knew him?

A. No, I don't remember that.

Q. Page 10. "But one, one of the dudes, one of the dudes who I – I could have sworn I seen his face, I'll never forget his face, Bro, because I swear I know him." Do you remember telling that to law enforcement?

A. No. I remember telling them that the person that they had said when my . . . homeboy had told them that it was my cousin, I said, "Yeah, I know him and I know what he look like."

     . . . .

Q. Mr. Ballou, not just that you knew him; you were giving the description of the taller person that came into the house . . . . that morning, October the 7th; is that correct?

A. Yeah, I gave a description of what I saw, yes.

Q. Do you remember telling law enforcement that that taller person was actually, you thought, related to you some way?

A. Yeah. Yes, I remember that.

At that point, the State indicated during a bench conference on an unrelated issue a desire to admit the audio recording of Mr. Ballou's statement as substantive evidence under Rule 803(26). The trial court and the parties discussed whether Mr. Ballou had to deny making the statement before it would be admissible under the rule, and the court opined that so long as the statement was inconsistent and made under circumstances indicating

trustworthiness, it could be admitted under the rule. The court ruled that the audio recording would be admissible and noted that while it was probably advisable for the court to "parse out the parts that are inconsistent," such process "would require us to wait until later in the trial, have . . . the court reporter[] type out the transcript and then argue about which parts are actually inconsistent." Deeming this process too onerous, the court ruled that "the substance of the statement in its totality should be considered." After defense counsel expressed concerns about references in Mr. Ballou's statements to Mr. Jones's prior incarceration and gang affiliation, the court concluded that "at a later point the Court will allow a redacted statement of Mr. Ballou to come in."

The prosecutor continued to question Mr. Ballou about his October 7, 2011 statement after the trial court made its ruling:

> Q. Do you understand that you told law enforcement the morning of October the 7th of 2011 that you knew him, that you were related to him, and that you saw him come in?
> A. I ain't know nothing about the "saw" part.
> Q. Okay.
> A. Because if I saw him come in then, like when you played the 911 call, it wouldn't have been no reason for Mr. Daniel to come up and tell me that it was my cousin.
> Q. Okay.
> A. If I seen him, I would have knew who he was.
> Q. Okay. So it's your testimony that you did not see him come in?
> A. Right.
> Q. All right. And it's your testimony that when you were talking to law enforcement, you were identifying Mr. Jones, D-Baby, because of your knowledge of him, not because of his involvement in the crime?
> A. Yeah, because his knowledge, because they asked something about "he supposed to be related to you," and then I asked them who they was talking about. They said Mr. Jones, and they asked me do I know him. I said, "Yeah, I know of him." And then they asked me a description, I told them a description from what I knew.
> Q. Okay. All – and it's your testimony here today in this court that all of that that you were telling them was not because of his involvement in the crime; just because you knew him, just because you were family?
> A. Pretty much.

-12-

. . . .

Q. Because that seems to me to be completely different than what you told law enforcement on the morning of October the 7th.

A. I told, I told them, I told – when I gave my statement that – when we went to the first court date, I sat there and told them when we was in the courtroom that I did not see them.

. . . .

Q. And by the time you came to the preliminary hearing, you testified differently than what you told law enforcement on that morning right after it happened; right?

A. Yes, sir.

. . . .

Q. Did you ever tell them in your original statement D-Baby's real name, Emmett Jones?

A. They, they asked me about D-Baby, then they asked me did I know of his real name, and I said that it was Emmett Jones.

Q. All right. Page 15. You're telling Detective Kilgore about D-Baby. You say, "I'm saying I know him. I know everything about him."

A. I didn't say that.

Q. . . . . Mr. Ballou, you just told me that when you left law enforcement, you told them D-Baby was Emmett Jones. That's not true.

A. I ain't say when I left. I said they asked who he was. They asked did I know this government name and I said "I think it's Emmett Jones."

. . . .

Q. The question is, "What's his name?" You say, "I don't know. All I know, dude something, when dude ran off, I don't know what his real name, but when dude ran off, dude said something about D-Baby."

A. Yeah, but I told you I wasn't ever close to them to hear that.

. . . .

Q. Okay. When you're giving them this information, are you talking about your cousin D-Baby as the person that shot Reggie Clark? Shot at Reggie Clark?

A. That's what we was discussing.

Q. Okay.

-13-

A. Because that's who they said that was, was there.

Q. Say that again.

A. I said that's what we were discussing because that's who they was asking me was he there, and then they asked me how did I know him, asked me what was our relationship, and then they had told me that – my, my friend Mr. Daniel had told them he was my cousin. That's why they started asking "How is he related to you?"

Q. Okay. So is it your testimony that when you're talking to law enforcement, the reason you're talking to them about D-Baby is because they brought it up to you?

A. No. It was already in the air. Everybody was saying the name.

Later, the trial court instructed the State that, upon further reflection, it had concluded that the State should limit the presentation of extrinsic proof of Mr. Ballou's prior statement only to those portions that were inconsistent with his trial testimony. Before introducing two portions of Mr. Ballou's pretrial statement during the direct examination of Detective Justin Kilgore, the State indicated that it had pulled out two portions it believed contradicted Mr. Ballou's trial testimony and that it had advised defense counsel of those portions it intended to play. The State then played a redacted version of Mr. Ballou's statement.

In the portion of Mr. Ballou's statement to Detective Kilgore, he unequivocally identifies Mr. Jones, whom he had identified as his "cousin," as one of the shooters, saying, "I know. I seen his face. That's why he looked at me crazy. He knew who I was." Contrary to his trial testimony, Mr. Ballou told Detective Kilgore that he attempted to enter the house during the shooting and that the shorter perpetrator told him to move while "D-Baby ran." Mr. Ballou told Detective Kilgore that he told Mr. Jones, "I seen your face. You know me, Bro."

*Admissibility Via Rule 613(b)*

To be sure, those portions of Mr. Ballou's prior statement that were played for the jury were inconsistent with his testimony at trial that he could not recall the events of the evening and that he did not see the perpetrators. *See State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015) ("[F]or the purposes of Tennessee Rule of Evidence 803(26), a prior statement about events that a witness claims at trial to be unable to remember is 'inconsistent' with the witness' trial testimony."). Although Mr. Ballou did not outright deny actually providing a statement to the police following the offenses, the overall tenor of his testimony was a complete repudiation of not only the contents of the statement but

-14-

also the circumstances under which it was given. His declaration of a lack of memory regarding the offense and his attempts to explain and recast the nature of his prior statement were pervasive and were of such a nature as to completely undercut the prior statement and, in reality, operated more as a denial of the prior statement. Mr. Ballou certainly did not unequivocally admit making the statement. As our supreme court has observed, even when a witness admits making a prior inconsistent statement,

> the judge, in the exercise of his discretion, may allow evidence where the witness undertakes to explain away prior inconsistent statements or excuse himself for having made them. So, where the witness claims the prior statements were made in jest, or under compulsion, or because of some other condition which rendered him blameless, the testimony of other witnesses may be introduced to show the contrary. In exercising his discretion the judge balances the need to expedite the case against the need to test the credibility of the witness.

*State v. Grady*, 619 S.W.2d 141, 143 (Tenn. Crim. App. 1980). Under these circumstances, we cannot say that the trial court abused its discretion by admitting the audio recording as extrinsic proof of the prior statement via Rule 613(b).

*Admissibility via Rule 803(26)*

As indicated, Tennessee Rule of Evidence 803(26) allows for the admission of a prior inconsistent statement as substantive evidence so long as the statement is admissible under Rule 613(b) and satisfies the other requirements of 803(26). To qualify for admission, the statement must be audio or video recorded, signed by the witness, or given under oath and must be "made under circumstances indicating trustworthiness." Tenn. R. Evid. 803(26)(B), (C). Additionally, "[t]he declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement." Tenn. R. Evid. 803(26)(A). The defendant does not contend that Mr. Ballou's statement failed to satisfy the procedural criteria for admission, and the record establishes that those conditions for admission via Rule 803(26) were satisfied.

Discussion of the admission of all or part of Mr. Ballou's statement to Detective Kilgore occupies a disproportionate portion of the trial record. The trial court and the parties examined the issue repeatedly prior to the admission of the statement, discussing both the applicable law and the unusual and erratic nature of Mr. Ballou's testimony. The court also heard proof, out of the hearing of the jury, that Mr. Jones had sent a threatening letter to the boyfriend of Mr. Ballou's sister, the gist of which

suggested retribution should Mr. Ballou identify Mr. Jones at trial. In addition, during a jury-out hearing regarding admission of the 9-1-1 recording, Mr. Daniel spontaneously offered information that he had been threatened in the jail and warned off of providing testimony against either of the defendants. *See* Tenn. R. Evid. 803(26), Advisory Comm'n Comments ("Many other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example."). We make these observations in recognition that review of a cold record sometimes does not present a complete and accurate portrayal of the trial. Clearly, the trial court struggled with this issue, and we have struggled with it on appeal. Mr. Ballou admitted making a statement to Detective Kilgore following the victim's murder, then he proceeded to testify in a manner that was completely inconsistent with that statement and which, as we have noted above, operated as a repudiation of the prior statement. Additionally, the State redacted Mr. Ballou's testimony to omit his references to Mr. Jones's prior incarceration and his gang affiliation and attempted, as best it could under the circumstances, to limit the portion of the statement played to the jury only to those portions that were inconsistent with Mr. Ballou's trial testimony. In our view, the trial court did not err by admitting those portions of Mr. Ballou's prior statement as substantive evidence pursuant to Rule 803(26) under the circumstances presented here.

### B. Ms. Lewis

At trial, Ms. Lewis testified that she, her grandmother, and her aunt all lived on Dee Drive near the victim's residence and that she often kept company with the victim. On October 6, 2011, Ms. Lewis went to Club 807 Fire and Ice, where she saw the victim, Mr. Daniel, and Mr. Bates. At some point, she overheard Mr. Daniel tell the victim that Mr. Bates's girlfriend had poured a drink on him. She recalled that the victim, who was armed with a handgun, and Mr. Daniel went back inside the club after Mr. Daniel told the victim about the drink pouring incident. The victim was then "put out" of the club by the bouncer after he pulled up his shirt and showed his weapon. Ms. Lewis said that she later saw Mr. Daniel "arguing a little bit" with Mr. Bates's girlfriend outside the club.

At that point, Ms. Lewis left the club with the victim, Mr. Daniel, "Fat Daddy . . . and the bald guy, the light-skinned" one. She said that Mr. Ballou and "Breeze" followed them to the victim's house. Ms. Lewis testified that as she got out of the car at the victim's house, she saw Mr. Bates going toward the house where he lived with relatives on Dee Drive. Once inside the victim's house, she went into the kitchen with the victim, Mr. Daniel, and Fat Daddy. She said that she then saw the victim get shot and that she did not know who had shot him. Ms. Lewis admitted that she told the police that "Poo-Poo and D-Baby" had shot the victim. When asked whether she was

telling the truth at trial or had told the truth to the police, she said, "It's been two years ago, and I just can't a hundred percent sure say no more." She added, "I just don't want to go through none of this. I just want to go home." Ms. Lewis acknowledged calling 9-1-1 to report the shooting and identified her voice on the call saying that she knew who had shot the victim. She then began to cry, said that she did not want to "go through none of this," and admitted that she was scared to testify.

At that point, the State attempted to refresh Ms. Lewis's recollection with her statement to Detective Emery, but, even after reading the statement, she said that she did not remember making the statement. After she answered that she could not remember when confronted with a few other statements from her interview, Ms. Lewis insisted that looking at the statement would not refresh her recollection. When asked whether she intended to answer "I don't remember" to every question about the defendants' involvement, she said, "I don't remember." The prosecutor then went through her statement line-by-line, asking whether she recalled having given the statement, and she answered consistently that she did not remember. When asked whether her memory of the offense would have been better at the time of the statement or at the time of the trial, Ms. Lewis began to cry and said, "No. I'm sorry. I'm scared. I can't do this."

Following a recess, Ms. Lewis testified on cross-examination in great detail about her activities following the shooting. When asked how she could recall those details with specificity but have no recollection of the offense or of her statement to Detective Emery, Ms. Lewis asked if she could "plead the Fifth." The trial court denied her request and ordered her to answer the questions asked of her to the best of her ability.

The following exchanges then occurred during further examinations of Ms. Lewis:

> [Prosecutor]. Was what you said in that statement to law enforcement true?
> A. If I said it, then it's true.
>       . . . .
> [Defense Counsel]. If you said it, then it's true; right? If you said it, then it's true?
> A. If that's what I said, I had to say it.
> [Defense Counsel]. Why?
> A. Because it's on paper that I said it.
> [Defense Counsel]. You afraid of being charged with perjury now? Is that why you want to take the Fifth Amendment?

Are you afraid of that? You have to admit it because you said it on paper; is that what you think now?

A. I don't want to answer your questions. Do I have to answer these questions?

[Defense Counsel]. You want a lawyer?

      THE COURT: That's my business, Mr. Ortwein.

      MR. ORTWEIN: Yes, sir. I'm sorry, Judge.

      THE COURT: We've already discussed that.

      . . . .

      THE COURT: Answer the question.

[Defense Counsel]. You have to. Are you afraid that you'd be charged with a crime if you didn't admit what's in that statement on paper.

A. Yes.

      . . . .

[Prosecutor]. Has anyone other than Mr. Ortwein ever said the word "perjury" to you?

A. No.

[Prosecutor]. Have I ever said that word to you?

A. No.

[Prosecutor]. Anybody from law enforcement ever said that word to you?

A. No.

[Prosecutor]. Just Mr. Ortwein here; right?

A. Yes.

Ms. Lewis broke down several times during her testimony, expressing fear and anxiety about testifying against the defendants.

The trial court ruled that because Ms. Lewis said she did not recall making any of the statements in her interview, and because the prosecutor went through the inconsistencies line by line, the State would be permitted to play almost the entirety of her statement to Detective Emery. The court explained its ruling:

But, so everybody can know how to prepare, here's what I'm going to do: I'm going to allow the statement of Larinder Lewis to be played, because there was so much of it – the appellate court, if this goes up on appeal – and these defendants might not be convicted in light of the evidence, I don't know whether they're going to be or not, but in the event that the case should go up on appeal, the appellate court

would not have had the opportunity to see what the [c]ourt observed, which is Larinder Lewis basically here on the witness stand, shaking, extremely emotional. The record will reflect that she asked for a break at one point initially when she was asked – when she was asked whether she saw who shot Reginald Clark, she advised she needed to take a break because she was having a panic attack.

I don't know that I would describe her as uncooperative, but it was clear to everybody in the courtroom that she was not going to implicate either defendant under any set of circumstances.

. . . .

But I say all that to say that the Court observed that she would not give much of anything at all here in court toward what she said to the police detectives that was consistent with what she told the police detectives. So most of her statement, the majority of her statement is inconsistent, and so I'm going to allow it to be played.

The court determined that the State would be permitted to play Ms. Lewis's statement from "page 22 on" because the State confronted her with only that final portion of her statement.

In the portion of the statement played for the jury, Ms. Lewis clearly and unequivocally identified both defendants as the perpetrators, saying, "No doubt, I seen [sic] it." She said, "I just thank the Lord they didn't kill me, because they looked dead at me, and I guess they thought that I was from Dee Drive right along with them, I was just, I was going to just not do nothing." Ms. Lewis described Mr. Bates as approximately five feet, six inches tall and thin with a low fade haircut, wearing a Polo shirt and Polo hat. Ms. Lewis said that she begged Mr. Bates not to kill her.

*Admissibility Under 613(b)*

Ms. Lewis's continued insistence that she did not know who had killed the victim, that she could not remember the offense, and that she did not remember making a statement to the police is inconsistent with her very detailed statement to Detective Emery. The State confronted Ms. Lewis with the contents of her statement line by line, as required by the rule, and she expressed lack of memory at every turn. Because Ms.

Lewis testified that she did not recall making the statement, the audio recording of her statement was admissible as extrinsic proof of the prior statement under Rule 613(b). *See Martin*, 964 S.W.2d at 567.

*Admissibility Under 803(26)*

The portion of Ms. Lewis's statement that was played for the jury qualified for admission under the terms of Rule 613(b). Additionally, because her statement was audio recorded, because the trial court found that it was "made under circumstances indicating trustworthiness," and because Ms. Lewis testified and was subject to cross-examination at trial, *see* Tenn. R. Evid. 803(26)(A)-(C), the statement was admissible as substantive evidence under the terms of Rule 803(26). We note again the trial court's observation that Ms. Lewis was clearly afraid to testify against the defendants and the Advisory Commission Comment that Rule 803(26) was designed to "address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example." *Id.*, Advisory Comm'n Comments. It is our view that, under the circumstances presented in this case, the trial court did not err by admitting a portion of Ms. Lewis's statement to Detective Emery as substantive evidence.

Finally, although the defendants claimed during their oral arguments that the State called the witnesses for the sole purpose of impeaching them with their prior statements, neither defendant raises that issue in his brief. *See* Tenn. R. App. P. 27(a)(7) (stating that the argument portion of the appellant's brief must contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on"). In addition, the defendants made only a single, oblique reference to such a claim at trial. In consequence, we will not address this claim.

*III. Admission of 9-1-1 Recording*

Both defendants contend that the trial court erred by admitting into evidence the audio recording of Mr. Ballou's call to 9-1-1 because the call contains a reference to Mr. Jones having "just got out." They argue that the 9-1-1 recording was inadmissible under the terms of evidence Rules 401, 403, and 404. Specifically, they claim that the evidence should have been excluded because its probative value was outweighed by the danger of unfair prejudice. The State asserts that the defendants have waived our consideration of this issue by failing to make appropriate references to the record. In the alternative, the State avers that the trial court did not abuse its discretion by admitting the 9-1-1 recording.

As the State correctly points out, neither Mr. Bates nor Mr. Jones makes reference to those portions of the record where the trial court considered and rejected their challenges to the admission of the 9-1-1 recordings. Indeed, they do not actually specify the challenged recording as that of the 9-1-1 call placed by Mr. Ballou, saying only that one of the recordings captured a statement that one of the perpetrators was "your partner that just got out." We only discern that they are referring to Mr. Ballou's call based on the evidence presented at trial. Moreover, the briefs do not include any reference to the trial court's ruling on the challenge. These failures result in a waiver of plenary review of this issue.

## IV. Sufficiency

Finally, both defendants argue that the trial court erred by denying their motions for judgments of acquittal, claiming that the evidence was insufficient to support their convictions. The State submits that the evidence was sufficient to support the convictions.

A trial judge may direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See* Tenn. R. Crim. P. 29(a); *see generally Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978). The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Ball,* 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). That is, whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendants do not contend that the State failed to establish the elements of first degree premeditated murder. *See* T.C.A. § 39-13-202(a) ("First degree murder is . . . [a] premeditated and intentional killing of another"), or especially aggravated burglary, *see* Tenn. Code Ann. § 39-14-404(a) ("Especially aggravated burglary is . . . [b]urglary of a habitation or building other than a habitation . . . [w]here the victim suffers serious bodily injury."). Instead, the defendants claim that the State failed to establish their identity as the perpetrators. To this end, the defendants contend that the evidence adduced at trial, absent the prior inconsistent statements of Mr. Ballou and Ms. Lewis, which they claim were erroneously admitted, was insufficient to establish that they committed the victim's murder. As we have already concluded, however, the trial court did not err by admitting as substantive evidence portions of Mr. Ballou's and Ms. Lewis's prior inconsistent statements. Moreover, even if the evidence was erroneously admitted, it would be included in our calculus of the sufficiency of the evidence. *See State v. Longstreet*, 619 S.W.2d 97, 101 (Tenn. 1981).

The defendants also claim insufficiency on the basis of "the countless contradictions" in the testimony of the State's witnesses. The determination of the credibility of the witnesses and the resolution of conflicts in the proof lies solely within the province of the jury as the trier of fact, and this court is not free to revisit the conclusions drawn by the jury. *Dorantes*, 331 S.W.3d at 379

The evidence presented at trial established that Mr. Daniel had a heated exchange with Mr. Bates at Club 807 Fire and Ice and that the victim displayed a weapon to Mr. Bates following the altercation. Shortly after the victim returned to his residence with his friends, including Mr. Daniel, Mr. Ballou, and Ms. Lewis, two armed men entered the victim's house without his consent and opened fire. Three bullets struck the victim, and he died within moments. Mr. Daniel, Mr. Ballou, and Ms. Lewis all gave statements to the police shortly after the offense, and Mr. Ballou and Ms. Lewis unequivocally identified the defendants as the perpetrators. Ms. Lewis stated that she had known both men for some time, that she was familiar with their appearances, and that she was certain that they were the same two men who had entered the victim's house and shot him. Mr. Ballou identified Mr. Jones, whom he described as his "cousin," as the taller of the two shooters, stating that he was very familiar with Mr. Jones and that Mr. Jones had looked him in the eye during the shooting. Mr. Ballou identified Mr. Bates, with whom he was not familiar, as the shorter of the two men. The physical description of the perpetrators provided by Mr. Ballou and Mr. Daniel matched the physical descriptions of the defendants at the time of the offenses. Although Mr. Ballou and Ms. Lewis repudiated their statements to the police, the jury was free to accredit any portion of any witness's testimony as it saw fit. *See State v. Allen*, 69 S.W.3d 181, 189 (Tenn. 2002) ("The jury is not required to believe any evidence offered by the State."); *see also* Tenn.

Const. art. I, § 19 ("[T]he jury shall have a right to determine the law and the facts[.]"). This evidence was sufficient to support the defendants' convictions of first degree murder and especially aggravated burglary.

*Conclusion*

Based upon the foregoing analysis, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE